## In Re Hazleton City Authority

Before Flannery, Lewis and Pinola, JJ.

*John H. Bigelow, Richard L. Bigelow, Sr., Richard L. Bigelow, Jr.,* and *Edward A. C. Porter,* for appellant.

*R. Lawrence Coughlin, Donald S. Mills* and *Richard M. Hughes,* for appellees.

FLANNERY, J., January 19, 1949.—This is an appeal from a tax assessment imposed by the board of assessment and revision of taxes against premises owned by the Hazleton City Authority.

The properties affected consist of: (1) The Duplan property, a large steel and concrete building of five stories; (2) the Keller property, a three-story brick building, and (3) the garage property, a barn and garage.

These are disconnected and are located in various locations in the City of Hazleton.

The valuations ascribed to these properties, lands and buildings, by the county taxing authorities for tax purposes are as follows: (1) The Duplan property, $132,786; the Keller property, $25,450, and the garage property, $2,500.

No assessments have been imposed by the City of Hazleton.

The appeal is taken by the Hazleton City Authority in pursuance of the provisions of the Act of June 26, 1931, P. L. 1379, sec. 9, 72 PS §5350. It is predicated on the theory that these lands and the buildings erected thereon are exempt from taxation under the provisions of the Municipality Authorities Act.

It must be noted as a fundamental proposition of law that "a claimant for exemption must bring himself clearly within the exempting statute": Wynnefield United Presbyterian Church v. City of Philadelphia et al., 348 Pa. 252.

The Hazleton City Authority was incorporated under the laws of the State of Pennsylvania on October 18, 1938, under the Municipality Authorities Act of June 28, 1935, P. L. 463, and the various amendments and supplements thereto. The Act of 1935 was amended May 20, 1937, P. L. 739; May 17, 1939, P. L. 167; August 11, 1941, P. L. 896, and May 26, 1943, P. L. 661. The Municipality Authorities Act was reenacted on May 2, 1945, P. L. 382, as amended by Act of June 12, 1947, P. L. 571, 53 PS §2900z.

At the time of incorporation, i. e., in 1938, the purposes and powers of a municipal authority, as set forth in section 4 of the amending Act of May 20, 1937, at page 742, were as follows:

"Purposes and Powers; General.—Every Authority incorporated under this act shall be a body corporate and politic, and shall be for the purpose of acquiring, holding, constructing, improving, maintaining, and operating, owning, leasing, either in the capacity of lessor or lessee, buildings to be devoted wholly or partially for public uses and for revenue-producing purposes, transportation, marketing, shopping terminals, bridges, tunnels, streets, highways, parkways, traffic distribution centers, traffic circles, parking

spaces, airports, hangars, projects, parks, recreation grounds and facilities, sewers, sewer systems, sewage treatment works, water supply works, swimming pools, playgrounds, lakes, dams, hospitals, motor buses for public use when such motor buses are to be used within any municipality, and subways (any and all the foregoing being herein called 'projects'). . . . Every Authority is hereby granted and shall have and may exercise all powers necessary or convenient for the carrying out of the aforesaid purposes, including, but without limiting, the generality of the foregoing, the following rights and powers:

. . . . . . . . . . .

"(d) To acquire, purchase, hold, lease as lessee, and use any franchise, property, real, personal or mixed, tangible or intangible, or any interest therein necessary or desirable for carrying out the purposes of the Authority, and to sell, lease as lessor, transfer, and dispose of any property or interest therein, at any time acquired by it."

The section of the act has been reënacted and extended, as we have indicated supra. The latest legislative expression is the Act of June 12, 1947, P. L. 571. But the fundamental principles affecting our deliberations have remained unchanged: the projects are to be of the kind and character as enumerated in the Act of 1937 and the buildings to be owned or leased must be devoted wholly or partially for public uses as there provided.

The principal section of the act under which the exemption is claimed in this proceeding by the city authority is found in 53 PS §2900z, and reads as follows:

"16. Exemption from taxation.

"The effectuation of the authorized purposes of Authorities created under this act shall and will be in all

respects for the benefit of the people of the Commonwealth of Pennsylvania, for the increase of their commerce and prosperity, and for the improvement of their health and living conditions, and since such Authorities will be performing essential governmental functions in effectuating such purposes, such Authorities shall not be required to pay any taxes or assessments upon any property acquired or used by them for such purposes, and the bonds issued by any Authority, their transfer and the income therefrom, (including any profits made on the sale thereof) shall at all times be free from taxation within the Commonwealth of Pennsylvania": Act of May 2, 1945, P. L. 382, sec. 15.

Now what is the Hazleton City Authority? Let us refer to the Acts of 1935 and 1937, supra, under which it was created and organized. It will be observed that such an authority is not the ordinary, average and commonplace business corporation. It is not merely a *body corporate;* on the contrary, it is a *body corporate* and a *body politic.* It is so specifically provided in the statute.

What is a body politic? In order to define that term, we refer to Black's Law Dictionary in which "body politic" is given the following definition:

"Body Politic—the collective body of a nation or state as politically organized or as exercising political functions. . . .

"The term is particularly appropriate to a public corporation invested with powers and duties of government."

The use of the term "body politic" in this statute, therefore, has a special significance. It is by direct language, as well as by necessary inference, a body exercising governmental functions. The statute specifically declares that such an authority is a body exercising essential governmental functions: Act of May 2, 1945, P. L. 382, sec. 15.

The facts concerning the various properties, their acquisition and uses are important.

Prior to 1938 the Duplan Silk Corporation owned a lot of land improved with a building for its manufacturing purposes. This was a modern brick building of five stories. The first or basement floor contained more than 29,000 square feet and the remaining four stories 49,000 square feet each, or a total of more than 204,000 square feet.

In 1938 James F. Koch, subsequently to be the president of the Hazleton City Authority, was a member of the industrial committee of the Hazleton Chamber of Commerce. He was chairman of the committee. One of its purposes was to stimulate employment. Prior to the formation of the authority and its purchase of the Duplan property, negotiations were carried on by the committee to persuade the Columbia Novelty Slipper Company and the Penn Footwear Corporation to locate in Hazleton and the Duplan Silk Corporation was approached with the view to renting part of its property to these enterprises. The Duplan Silk Corporation refused to rent. It indicated an intention to discontinue its operation and expressed a willingness to sell, whereupon the committee, i. e., the industrial committee of the chamber of commerce, then turned to the City Council of the City of Hazleton for the creation of the Hazleton City Authority to arrange for the purchase of the building.

The authority was then incorporated and a prospectus advertising the building for industrial occupancy generally was given wide circulation.

The authority purchased from the Duplan Silk Corporation the building referred to on November 15, 1938, pursuant to an agreement dated November 1, 1938, reserving to the corporation the rental occupancy of the second and third floors. The price was $185,000,

and funds to finance the authority, in the amount of $200,000, were raised by the sale of its bonds.

The leases from the time of purchase, with their terms and rentals are as follows:

| Lessee | Term | Floor | Yearly Rental |
|---|---|---|---|
| Duplan Silk Corp. | 11/15/38 to 11/14/48 | Second and third floors | $12,000.00 |
| S. Liebovitz & Sons, Inc. | 3/1/39 to 8/1/39 | One half of fourth floor | $ 2,850.00 (6 mos.) |
| Penn Footwear Corp. | 3/1/39 to 2/28/45 | Fifth floor | $ 2,000.00 7,810.24 |
| S. Liebovitz & Sons, Inc. | 7/1/41 to 12/31/42 | Fourth floor | $ 9,000.00 |
| Hyman Davidowitz | 3/1/45 to 2/28/51 | Fifth floor | $10,200.00 |
| Duplan Silk Corp. | 3/1/46 to 2/26/51 | First, second and third floors | $21,000.00 |
| Duplan Silk Corp. (option) | 2/26/51 to 1/26/56 | | $24,000.00 |
| Publix Shirt Corp. | 1/1/47 to 12/31/51 | Fourth floor | $11,400.00 |
| Publix Shirt Corp. | 5/12/47 to 5/11/47 | 860 square feet of first floor | 540.00 |

The City of Hazleton occupied at the date of the hearing 500 square feet on the first floor without a formal agreement and used it for the storage of soil pipe, road materials, playground equipment, etc.

By deed dated June 20, 1947, the city authority acquired what is known as the Keller property situate at 215 West Broad Street, Hazleton, Pa. This property was a large dwelling previously occupied by the Pennsylvania State police for their squadron headquarters.

It appears that the city authority on June 11, 1947, leased this property to the City of Hazleton for the sum of $650 per month. It further appears that the

city then subleased the property to a private citizen for the purpose of housing the State police unit in that area under a rental arrangement, whereby such lessee was to pay the city 18 percent of the gross return, less $60 monthly. That arrangement paid the city $183.60 per month, or a net loss of $466.40, per month.

The Vine Street property was purchased from the Kellers at the same time as the so-called Keller property under deed dated June 20, 1947. It is improved with a wooden structure 40 by 65 feet and has a capacity for garaging 15 motor vehicles.

Following its purchase this property was rented by the authority to the City of Hazleton by lease also dated June 11, 1947. On July 14, 1947, the City of Hazleton rented this property to the Commonwealth of Pennsylvania, Pennsylvania State police, for the storage of 11 cars and 2 motorcycles at a monthly rental of $60 per month. Two automobiles of the city were likewise kept in this garage.

The bonds which the authority issued appear to be more than amply secured. The enterprise is flourishing and it is proposed that eventually the properties will become the properties of the City of Hazleton whose creature the authority is.

Counsel for the authority, appellant, contends that there is full compliance with the letter as well as the spirit of the act and that the real estate is, therefore, exempt from taxation as provided in the act.

Counsel for the county, appellee, contends that the authority is in effect the chamber of commerce in thin disguise; that the properties are not public property used for public purposes, the essential element of a valid tax exemption; nor are they "buildings to be devoted wholly or partially for public uses", as required in section 4 of the amendatory Authority Act of May 20, 1937, P. L. 739.

Viewed in the light of 1938, which was a time of economic and industrial travail, the project would seem inspired. It did retain old industries which were uncertain of their future plans and it did attract new industries as the records indicate. In this way it afforded employment for the citizens of Hazleton which promoted their prosperity and general welfare. But it is not enough that the ends designed by the statute be attained; they must be attained by the means there provided if the project is to come within the benevolent protection of the Municipality Authorities Act.

As we view the problem, the question to be resolved is: Do the purposes to which the buildings are devoted come within the purposes specified in the act? Or are the properties devoted to public uses wholly or partially within the intendment of the statute?

The answer to these questions determines whether the properties are taxable or tax exempt.

The Constitution provides, article IX, secs. 1 and 2:

"All taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws; but the General Assembly may, by general laws, exempt from taxation public property used for public purposes, actual places of religious worship, places of burial not used or held for private or corporate profit, institutions of purely public charity, and real and personal property owned, occupied, and used by any branch, post, or camp of honorably discharged soldiers, sailors, and marines.

"All laws exempting property from taxation, other than the property above enumerated shall be void."

The General County Assessment Law of May 22, 1933, P. L. 853, 72 PS §5020-201, provides for taxation of property and section 204 (*g*), as amended May 3, 1943, P. L. 158, specifies that "All other public property used for public purposes, with the ground

thereto annexed and necessary for the occupancy and enjoyment of the same . . ." shall be exempt from taxation.

The Authority Act, supra, provides that land may be owned, provided it is devoted to the purposes there described and it further provides that such land so held and so devoted shall be exempt from taxation.

What then is interpretation of the words "devoted wholly or partially for public uses"? Or what is meant by the phrase "use for public purposes"? It was stated in Pennsylvania Mutual Life Ins. Co. v. Philadelphia, 242 Pa. 47, at page 53:

". . . There is no constitutional or statutory definition of the words 'public use', and none of the adjudicated cases has given a definition of the words which can have universal application. . . ."

But while none of the adjudicated cases have given a definition of the words which can have universal application they do define the phrase in relation to the specific cases of which they treat. In these decisions they point the way which we must travel in considering the question raised here.

In Dornan v. Philadelphia Housing Authority et al., 331 Pa. 209, at page 221, it was stated:

"On the whole, although the cases on this subject in Pennsylvania have been comparatively few in number, it may fairly be stated that, while firmly maintaining the principle that private property cannot be taken by government for other than a public use, they justify the conclusion that judicial interpretation of 'public use' has not been circumscribed in our State by mere legalistic formulas or philological standards. On the contrary, definition has been left, as indeed it must be, to the varying circumstances and situations which arise, with special reference to the social and economic background of the period in which the particular problem presents itself for consideration.

Moreover, views as to what constitutes a public use necessarily vary with changing conceptions of the scope and functions of government, so that today there are familiar examples of such use which formerly would not have been so considered. As governmental activities increase with the growing complexity and integration of society, the concept of 'public use' naturally expands in proportion."

The question there concerned the taxation of property acquired by the housing authority for slum clearance. The court held that such was a public use and the properties were tax exempt. It is to be noted that although the dwellings owned by the authority were leased for private residence, the case was distinguished on the ground of police power in slum clearance—slum clearance being defined as:

"Any area in which there is a predominance of structures which, by reason of dilapidation, overcrowding, faulty arrangement or design, lack of ventilation, light or sanitary facilities, or any combination of these factors, are *detrimental* to *safety, health, and morals.*" (Italics supplied.)

We believe that while the review of the subject generally as contained in that case is of great interest in the consideration of the instant one, it is, however, not controlling because of the elements which clearly distinguish it from the case at bar.

In the case of Pittsburgh School District v. Allegheny County, 347 Pa. 101, in an opinion written by Mr. Chief Justice Maxey, at pages 105, 106, it is held that the rental of two plots of ground formerly containing school buildings for parking lot purposes, was not a public use and the plots were subject to taxation:

"Cooley on taxation, supra, sec. 640, says: 'If public property is exempt only when devoted to a public use, the question arises as to the effect of receiving an income from public property. This depends, at least

to some extent, on the nature and source of the income. The income may be (1) merely incidental to a public use of property, or it may be (2) the direct result of a lease of all the property. If the income is merely incidental, the rule is well settled. Where the primary and principal use to which property is put is public, the mere fact that an income is incidentally derived from it does not affect its character as property devoted to a public use, so as to prevent its being exempt from taxation.' . . . 'The second class of cases relate to income not incidental to the use of the public property, but the result of a lease of the property or other arrangement whereby revenue is the primary purpose. As to this class the law is not so well settled. Some cases hold, expressly or in effect, that if an income or profit is derived from public property, not as an incident to its use as a public agency, but as a direct result of a lease of the property or other arrangement whereby revenue is the primary purpose, the property is taxable because not held for a public purpose.' Cooley cites nine jurisdictions where the above rule is judicially recognized. Cooley also says, sec. 641: 'An exemption of lands owned by a city for public purposes means a present, and not an indefinite, prospective, use.' (Citing cases.) 61 Corpus Juris, sec. 367, p. 370, states the rule as follows: 'There is no implied immunity from taxation of property owned by a municipal corporation, but which is not devoted to public or governmental uses, but held by the municipality in its private or commercial capacity and as a source of profit or to serve some mere convenience of the citizens.' Citing cases, including Com. v. Philadelphia R. T. Co., 287 Pa. 70, 134 A. 452."

Here, the statute, having authorized the holding of property provided it is devoted to public use, then proceeds to enumerate specifically those purposes for which an authority may be organized and its prop-

erty so dedicated. A review of that enumeration will reveal that it involves projects of general, present, direct benefit and common public usage and enjoyment, such as terminals, bridges, tunnels, flood control projects, recreation grounds and facilities, sewers, sewer systems or parts thereof, sewage treatment, etc., etc. These are present, direct uses, not indirect or prospective uses. Nowhere in the statute is there any indication that an authority may be constituted for the purpose of acquiring real estate to be leased for industrial purposes in the manufacture of silks or novelties, or slippers. These were not contemplated by the legislature and by no stretch of the imagination can they be included by necessary implication in the general public purposes for which an authority may be created.

In the interpretation of this statute we are guided by the Statutory Construction Act of May 28, 1937, P. L. 1019, 46 PS §551, which provides, inter alia:

"The object of all interpretation and construction of laws is to ascertain and effectuate the intention of the Legislature. Every law shall be construed, if possible, to give effect to all its provisions.

"When the words of a law are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit. . . ."

Not only are we persuaded that there was no intention on the part of the legislature to include aid to private competitive industrial operations but on the contrary the types of works—so-called projects— which are enumerated, covering as they do a pattern involving public services, or public benefit, or public works would indicate a legislative intention to exclude definitely the promotion of private industry, and the projects under consideration are in the final analysis the promotion of private industries.

We are aware of the theory of appellant that the purpose was not to aid the Duplan Silk Corporation or the slipper company, or the other lessees, but to aid the people of Hazleton by supplying employment. That they might have done had they embarked upon any of the projects specified in the act or those which may be included by necessary implication. But when they joined with industrial corporations for manufacture of goods which got upon a competitive market in order to render help to the citizens of Hazleton they went beyond the boundaries of the act.

Counsel for appellant points to the decision of the Supreme Court in Commonwealth of Pennsylvania, State Employes' Retirement System, v. Dauphin County et al., 335 Pa. 177. It is true that real estate there was held by the State Employes' Retirement System and it was leased to tenants for private and commercial purposes. And it is true that the Supreme Court held, under the circumstances of that case, that the use was a public one. There the State Employes' Retirement System invested $400,000 of its fund in a bond and mortgage. Upon default in interest and taxes the properties were sold at sheriff's sale. It was purchased by the Commonwealth on behalf of the retirement system to protect the investment. It will be noted that the primary intention there was not to acquire real estate. That was merely an incidental step for the purpose of protecting the original investment. And the court concluded with these words:

"Here the chief use of this property by the Commonwealth is as an investment of the retirement fund, and merely a temporary investment. The duty of the Retirement System's officers is to dispose of the property as soon as it is advisable to do so, and the presumption is that this duty is not being violated."

In the case at bar the property was, on the contrary, not incidental to the investment of funds but was the

primary purpose of the enterprise. It was not a temporary investment of funds for safe keeping but was purchased for private industrial purposes by a prearrangement with the subsequent lessees who occupied the premises both before and after its acquisition by the authority, and according to the present plans will occupy it indefinitely.

In Commonwealth v. Dauphin County et al., 354 Pa. 556, the court held property acquired by the State Workmen's Insurance Board, which was rented for private uses, to be tax exempt. But there again was a situation similar to the situation in the State Employes' Retirement System case, supra. In other words, the Workmen's Insurance Board invested funds of that body in a mortgage and to protect itself upon default took over the real estate temporarily to secure its investment. With both of these agencies, the Retirement Fund and the State Workmen's Insurance Board, the prime purposes for which they were created was the accumulation and investment of funds for insurance purposes of a public character. The investment in mortgages was eminently proper. The acquisition of the security to be held temporarily for the purpose of protecting those investments is unquestionably a public use. It was acquired for no other purpose. It represents the fund invested.

We have been discussing the law with particular reference to the Duplan property. But we cannot see any distinction between this and the others. It may be alleged that the Keller property provides a center for the State police. But it must be remembered that the Keller property is leased to the City of Hazleton and by it to a private citizen and by that private citizen to the State police. As with the Duplan Silk Corporation, so with the Keller property. This is a private use by a private citizen. There is nothing in the

act, either specifically or by necessary inference, that would authorize such an accommodation as a boarding or rooming house for such purposes.

It might be contended that the garage property dedicated to parking comes closest to legislative approval. The act does provide that one of the purposes for which property shall be "devoted" is "parking spaces". But the contents of the act so clearly indicate that there is meant by this public parking available to the citizenry generally that we have no hesitancy in saying that a private lease to a private individual—even though in this case it may be the city—for the purpose of housing the vehicles of the State police, is not a public purpose, as contemplated in the act.

It may be relevant to point to another phase of the matter. The Keller property and the garage property come within the shadow of a prohibition that does not apply to the Duplan property. The original act banned those projects which might come into competition with private enterprise. This was eliminated by the amendment of 1937 and was not in the law when the authority was formed and the Duplan property was acquired. Later it was added and was included specifically in the Act of 1945, supra. It was in effect when the Keller and the garage properties were acquired. The question, therefore, arises as to whether or not these come into competition with private business: The real estate business, the garage business, and the hotel business. But it is unnecessary to review this aspect of the problem in view of our disposition of the principal question before us.

We are satisfied, under the circumstances developed by the testimony, that the uses to which these properties are devoted, are not public uses as contemplated in the Constitution or any of the acts of assembly and, accordingly, appellant cannot prevail.

There is one question remaining. There are 500 square feet of the Duplan property and two car spaces of the garage property used by the city without remuneration. We have not considered these for the reason that we regard them as being too trivial and incidental to defeat our conclusions here. They are slight deviations from the principal undertaking. In the absence of any formal arrangement we are satisfied that they are mere courtesies of the Hazleton City Authority extended to its parent, Hazleton City, which have no bearing on the point in controversy and, therefore, cannot even pro tanto affect the result.

Now, therefore, January 19, 1949, the appeal from the tax assessment imposed by the board of assessment and revision of taxes against premises owned by the Hazleton City Authority is dismissed and the exemption from taxation is denied.